[Civ. No. 11967.   First Dist., Div. One.   Oct. 27, 1942.]

R. M. MILLER, Appellant, v. CALIFORNIA ROOFING
CO. (a Corporation) et al., Respondents.

Vincent W. Hallinan and James A. Himmel for Appellant.

Emmet W. Gottenberg, David M. Burnett and John M. Burnett for Respondents.

WAGLER, J. pro tem.—This is an appeal from a judgment in favor of defendants in an action brought to recover the sum of $2,500 paid by plaintiff for twenty-five shares of the capital stock of defendant corporation. Plaintiff also appeals from an order denying his motion to strike defendants' cost bill.

The defendant California Roofing Co. is a California corporation, organized in September, 1931, by the defendants Phelps, Edwards and Norton, who are the present directors.

In 1936 the plaintiff, who is a relative of defendant Edwards, entered the employ of the corporation as a salesman. Shortly thereafter plaintiff expressed to his employers a desire to become financially interested in the company, but was advised that it was not possible at that time.

In February, 1938, plaintiff became manager of the company's Palo Alto branch office, at which time plaintiff learned that capital was needed for some contemplated expansion. After preliminary negotiations and discussion, plaintiff deposited $5,000 to the credit of the defendant corporation, in return for which he received the following document:

"February 18, 1938.

"Received of R. M. Miller $5,000.00 to be applied as follows: $2500.00 to apply on the purchase of 25 shares of the Capital Stock of the California Roofing Co., Inc.

"The balance of $2500.00 to be covered by a five year note bearing interest at the rate of six per cent per annum from February 18, 1938.

"California Roofing Co., Inc.
"by W. A. Edwards, Secty. Treas.
"W. A. Edwards."

It is conceded that on February 18, 1938, the defendants had received no permit of any character from the Commissioner of Corporations to sell or offer to sell any stock, and that, although the corporation was organized in 1931, no stock was ever issued to anyone prior to July 26, 1938. On this date a permit was issued by the Division of Corporations allowing the corporation to sell 250 shares of stock to Norton-Phelps Lumber Co. and to Phelps, Norton and Edwards in

exchange for certain business assets transferred by them to the defendant corporation.

On November 1, 1938, a permit was obtained allowing the corporation to sell plaintiff twenty-five shares of stock at $100 per share; said permit to become effective only after the shareholders above mentioned should execute and file with the Commissioner of Corporations an agreement whereby they waived any division of assets, with the exception of ordinary dividends, until plaintiff was reimbursed for his $2,500 investment. In compliance with this permit, the following agreement was executed on December 15, 1938:

"This agreement dated December [1]5, 1938, between Norton-Phelps Lumber Co. a corporation, H. K. Phelps, J. E. Norton and W. A. Edwards, first parties and Richard M. Miller, second party, WITNESSETH:

"That in consideration of the subscription of the second party to 25 shares at $100 a share of the capital stock of The California Roofing Co. first parties, the owners of 250 shares of said capital stock in the following respective amounts:

| | |
|---|---|
| "Norton-Phelps Lumber Co............ | 123 shares |
| "H. K. Phelps................... | 1 share |
| "J. E. Norton................... | 1 share |
| "W. A. Edwards................. | 125 shares |
| "Total ..................... | 250 shares |

hereby waive their right to participate in any distribution of assets of said The California Roofing Co., excepting dividends payable according to law, until second party shall first have received the return of the amount of the purchase of said shares, namely, $2,500.

"It is understood that upon dissolution of The California Roofing Co. that second party shall first receive the return of said purchase price of $2,500.00 before first parties participate in said distribution.

"It is mutually covenanted and agreed that the provisions of this contract shall apply to and bind the heirs, executors, administrators and assigns of the respective parties hereto.

"Subscribed this – 15 – day of December, 1938."

This agreement was signed by plaintiff and all of the defendants, and was thereafter filed with the Commissioner of Corporations.

On January 5, 1939, plaintiff was issued a certificate for

the twenty-five shares. Late in the year 1940, after losing money consistently on the Palo Alto branch, of which plaintiff was manager, defendants decided to close the Palo Alto office, and at a time when plaintiff's discharge was imminent plaintiff gave notice of rescission and demanded the return of the $2,500, plus interest, on the ground that the sale of the stock was void. Upon refusal of his demand, the present action was instituted.

The trial court found that the document of February 18, 1938, was a mere receipt for money advanced by plaintiff to apply on the purchase of stock of defendant corporation; that a valid subscription agreement was entered into between plaintiff and defendants on December 15, 1938, in pursuance of a permit issued to defendants on November 1, 1938, and that said stock was validly issued to plaintiff on January 5, 1939.

The real issue here is not whether the stock was validly issued, but whether the sale was a valid sale under the Corporate Securities Act (Deering's Gen. Laws [1937], Act 3814). If the sale was valid, plaintiff cannot recover on the theory upon which the action is brought. If the sale was invalid, the further question then arises: Was the plaintiff *in pari delicto* under the facts and circumstances disclosed by the record?

The sale in this case was initiated by what appears to have been an executory oral agreement between plaintiff and defendant corporation. Plaintiff's obligation under the agreement was fulfilled on February 18, 1938, when he paid over his money and received the writing bearing the same date. By this document the defendant corporation very definitely bound itself to sell plaintiff twenty-five shares of its stock at some time.

The Corporate Securities Act forbids a company, except as authorized by certain specific statutory provisions not applicable here, to sell, offer for sale, negotiate for the sale of or take subscriptions for any security of its own issue without first receiving a permit from the Commissioner of Corporations permitting it to do so. (Deering's Gen. Laws [1937], Act 3814, § 3.)

Section 33 of the same act authorizes the taking of subscriptions for shares without a permit, but the same section specifically provides that "nothing herein contained shall be construed as permitting the collection of any portion of the consideration to be paid on account of such subscriptions,

unless and until a permit shall have been issued by the commissioner authorizing such collection.''

■ From the foregoing it is apparent that regardless of whether we consider the transaction entered into on February 18, 1938, a sale, an offer to sell, or a mere attempted subscription, and the document a mere receipt, the plaintiff having parted with and the defendant corporation having accepted the sum of $2,500 in pursuance thereof, without a permit, the defendants were guilty of a public offense. (Deering's Gen. Laws [1937], Act 3814, §§ 17 and 18.) This violation of the Corporate Securities Act rendered void the transaction consummated on February 18, 1938.

''. . . where a statute prohibits or attaches a penalty to the doing of an act, the act is void, and this, notwithstanding that the statute does not expressly pronounce it so, and it is immaterial whether the thing forbidden is *malum in se* or merely *malum prohibitum*.'' This rule stated by our Supreme Court in the oft-cited case of *Smith* v. *Bach,* 183 Cal. 259, 262 [191 P. 14], has been adopted and consistently applied in situations involving violations of the Corporate Securities Act. (*Otten* v. *Riesener Chocolate Co.,* 82 Cal.App. 83 [254 P. 942]; *Boss* v. *Silent Drama Syndicate,* 82 Cal.App. 109 [255 P. 225]; *Reno* v. *American Ice Machine Co.,* 72 Cal.App. 409 [237 P. 784]; *Payne* v. *De Vaughn,* 77 Cal.App. 399 [246 P. 1069]; *Tatterson* v. *Kehrlein,* 88 Cal.App. 34 [263 P. 285]; *Brewis* v. *Toffelmier,* 97 Cal.App. 329 [275 P. 819]; *Castle* v. *Acme Ice Cream Co.,* 101 Cal.App. 94 [281 P. 396]; *Herkner* v. *Rubin,* 126 Cal.App. 677 [14 P.2d 1043]; *Duntley* v. *Kagarise,* 10 Cal.App.2d 394 [52 P.2d 560]; *Levinson* v. *Boas,* 150 Cal. 185 [88 P. 825, 11 Ann.Cas. 661, 12 L.R.A. N.S. 575]; *Domenigoni* v. *Imperial Live Stock etc. Co.,* 189 Cal. 467 [209 P. 36].)

The subsequent conduct of the parties did not give validity to the sale, because the contract of December 15, 1938, was connected with, in fact, grew immediately out of, the previous illegal transaction. ■ It is well settled that: ''If an agreement grows immediately out of, or is connected with, an illegal or immoral act or agreement, a court cannot lend its aid to enforce it, though it is in fact a new agreement. If the connection between an original illegal transaction and a new promise can be traced, if the latter is connected with, and grows out of, the former, no matter how many times and in how many different forms it may be renewed, it cannot form the basis of a recovery.'' (12 Am.Jur., p. 717, § 210.)

We are not unmindful of the case of *Moore* v. *Moffatt,* 188 Cal. 1 [204 P.220], and subsequent decisions following the rule therein announced to the effect that even though a subscription agreement may be void and incapable of acceptance in the first instance, it should, in the light of the subsequent conduct of the parties to the transaction, be considered and construed as a continuing offer to subscribe for the stock in question, pending the procurement of a permit from the Commissioner of Corporations, which ultimately becomes the embodiment and expression of a new agreement to purchase the stock entered into at a time when the only legal obstacle in the way of a valid agreement has been overcome. As pointed out in *California Western Holding Co.* v. *Merrill,* 7 Cal.App.2d 131 [46 P.2d 175] at page 151, the doctrine announced in *Moore* v. *Moffatt, supra,* "is intended to be, an exception to the general rule, and applies only to those situations in which a representative of creditors is attempting to recover from parties to whom stock has been issued without full payment, or where the rights of innocent third parties intervene."

It is obvious that neither of the above exceptions exists in this case. Furthermore, our approval of the method adopted by the parties to this action to issue the stock in question would hinder the effective enforcement of regulations which public policy demands shall be strictly enforced.

■ Many of the decisions involving the sale of securities in violation of the Corporate Securities Act appear to place the purchaser's right to recover upon the theory that the securities are void. It is true, as pointed out by defendants, that the shares in this case cannot be held to be void because they were not "issued" to plaintiff until after a permit had been obtained, and then only in strict compliance with the requirements of the permit. In other words, the factual situation is one not contemplated by section 16 of the act which declares that shares issued without a permit or in non-conformity therewith shall be void. However, as we pointed out at the outset, the question here involved is the validity of the *sale,* not the validity of the *shares.* The distinction is clearly pointed out in the case of *Otten* v. *Riesener Chocolate Co., supra;* see, also, *Duntley* v. *Kagarise, supra.* The fundamental theory underlying all of these cases is the fact that a sale, which for any reason is in violation of the Corporate Securities Act, should on the grounds of public policy

be held to be illegal. In the furtherance of this policy we so hold in the case at bar.

■ This holding, however, does not determine all of the issues involved in this case. Even though the sale was illegal, there still remains the question whether or not the plaintiff was *in pari delicto*. The trial court found that the plaintiff was "estopped from asserting against defendants any claim..." This was the wrong designation of the applicable doctrine. In 12 Am.Jur., page 740, section 222, it is stated: "The doctrine of estoppel by conduct or by laches has no application to an agreement or instrument which is illegal because it violates an express mandate of the law or the dictates of public policy. Neither action nor inaction of a party to such an agreement can validate it; and no conduct of a party to it can be invoked as an estoppel against asserting its invalidity." (See, also, *Reno* v. *American Ice Machine Co., supra; Pollak* v. *Staunton*, 210 Cal. 656 [293 P. 26]; *Walker* v. *Harbor Realty etc. Corp.*, 214 Cal. 46 [3 P.2d 557].) However, although the learned court below did not affix the appropriate legal tag, it is plain that he had in mind the doctrine of *in pari delicto*.

■ In an action between the purchaser of stock sold in violation of the Corporate Securities Act and the corporation, ordinarily such purchaser will not be held to be *in pari delicto,* because the Corporate Securities Act was enacted primarily for the protection of the investing public. ■ Where contracts or transactions are prohibited by positive statute for the sake of protecting one set of men from another set of men—the one from their station and condition being liable to be imposed upon by the other—in the furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract. (*Browning* v. *Morris*, 98 English Reports [Full Reprint] 1364; *Tatterson* v. *Kehrlein, supra; Mary Pickford Co.* v. *Bayly Bros.* Inc., 12 Cal.2d 501 [86 P.2d 102]; *Eberhard* v. *Pacific Southwest L. & M. Corp.*, 215 Cal. 226 [9 P.2d 302]; *Walker* . v. *Harbor Realty etc. Corp., supra; Pollak* v. *Staunton, supra*.) This is true even though both parties are to some extent involved in the illegality. In such event, since the policy of the law designed to discourage illegal agreements comes in conflict with that policy which demands the effective enforcement of the Corporate Securities Act, the law differentiates the guilt of the parties, because refusal of relief to the less

culpable would involve harmful effects wholly out of proportion to the requirements of individual punishment or the discouragement of illegal contracts. (Williston on Contracts [1938 ed., vol. VI, pp. 5085, 5086, § 1789.)

When the action is between the purchaser and the corporation, the law attaches such great importance to the policy underlying the Blue Sky Law that the purchaser must be equally culpable with the corporation before he will be held to be *in pari delicto*. (*Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 P.2d 971, 88 A.L.R. 1271]; *Randall* v. *California L. B. Syndicate*, 217 Cal. 594 [20 P.2d 331]; *Walker* v. *Harbor Realty etc. Corp., supra; Campbell* v. *Julian Merger Mines,* 111 Cal.App. 649 [295 P. 1040].) A less degree of culpability may be sufficient where the rights of innocent third parties have intervened. (*Domenigoni* v. *Imperial Live Stock etc. Co., supra; Michell* v. *Grass Valley Gold Mines Co.,* 206 Cal. 609 [275 P. 418].)

In the case at bar we are not dealing with a situation where the buyer was "imposed upon" or was "induced" to make the purchase by any conduct of the seller. Quite the contrary, it appears that the plaintiff was more interested in acquiring the stock than the defendants were in selling it. The plaintiff himself testified that he was the one "who broached the subject of purchasing the stock right after he had been employed by the defendants." The trial court found "that at and before the time that plaintiff actually paid to defendant corporation the said sum of $2,500.00 for the purchase price of the stock in defendant corporation on February 18th, 1938, plaintiff was informed by the defendants and knew that defendant corporation was not at that time authorized to issue stock to plaintiff and that legal proceedings would have to be taken before any stock could be issued to plaintiff." Plaintiff attacks this finding on the ground that it is unsupported by the evidence. On this issue the plaintiff testified emphatically that the necessity for legal proceedings before the stock could be issued to him was never discussed with him or in his presence, and that the first time he learned that defendants had no permit on February 18, 1938, was on or about October 1, 1940, after he had consulted his own attorney regarding the pending termination of his employment. The defendant Edwards testified, however, that he had numerous discussions with the plaintiff before February 18, 1938, on the necessity of taking care of

the legal formalities before a permit to sell stock could be obtained, and that when the $2,500 was paid on February 18, 1938, it was understood by all parties that no certificate could issue until the corporation's attorney could take the necessary legal steps. The defendant Phelps testified that he recalled a conversation between plaintiff and Edwards at or about the time when the money was paid in, at which the question came up as to when the stock would be issued; that Edwards told plaintiff that certain legal proceedings would have to be taken first; that the matter would be turned over to the corporation's attorney to do whatever was necessary; that plaintiff voiced no objection to this arrangement; and that before the agreement of December 15, 1938, was signed the reasons for such agreement were explained to plaintiff by Edwards in his (Phelps') presence. The record shows that this agreement was signed by plaintiff himself, a fact which is inconsistent with plaintiff's emphatic testimony which fixes the date of his first knowledge of the lack of a permit at October 1, 1940. We conclude that the finding complained of is not only supported by substantial evidence, but by what appears to have been a decided preponderance thereof.

When plaintiff was being examined concerning this agreement, to the question, ''What was your object in signing it?'' he replied, ''There is nothing to cause me not to sign it, I still thought I was a stockholder.''

By this document all of the parties in effect represented to the Commissioner of Corporations that no sale had yet taken place and that $2,500 in new capital was to come into the corporation, when in truth and in fact the plaintiff already considered himself a stockholder and the $2,500 had been received by the corporation some ten months before and had been used by it in the expansion program. The plaintiff knew from the first that a permit was required, he also knew that none had been obtained when he parted with his money, and he was so intent in his determination to obtain a financial interest in the defendant company that he was willing to execute an agreement, the effect of which constituted a fraud upon the Commissioner of Corporations.

Plaintiff did not institute his action until almost two years after the shares were issued, and we are inclined to agree with the opinion of the trial court that ''had business conditions been different, the suit would probably have never been filed.'' Viewing the transaction as a whole, we believe the

plaintiff was equally culpable with the defendants, therefore *in pari delicto* and not entitled to recover. (*Campbell* v. *Julian Merger Mines, supra.*)

Plaintiff contends that his motion to strike defendants' memorandum of costs and disbursements should have been granted because the cost bill was served and filed too late.

The findings and judgment were drafted by defendants and submitted to the trial judge, who signed them on June 30, 1941. The judgment was entered on July 1, 1941. On July 9, 1941, defendants served plaintiff with a notice of entry of judgment and a memorandum of costs and disbursements. These documents were filed with the clerk of the court on July 14, 1941.

Section 1033 of the Code of Civil Procedure, as amended in 1931, reads as follows:

"The party in whose favor the judgment is ordered, and who claims his costs, must serve upon the adverse party, and file at any time after the verdict or decision of the court and not later than five (5) days after the verdict or, if the action is tried without a jury, not later than five (5) days *after notice of the entry of the judgment,* a memorandum of the items of his costs and necessary disbursements in the action or proceeding . . ." (Emphasis added.)

Defendants contend that by virtue of the provisions of section 1010 of the Code of Civil Procedure the notice referred to in section 1033 means written notice. However, this point was decided adversely to defendants' contention in *Kallmeyer* v. *Poore,* 52 Cal.App.2d 142 [125 P.2d 924], wherein it was held that actual notice was sufficient. This decision is consistent with the earlier cases interpreting section 1033 as it read prior to 1929, when it required the service and filing of the memorandum within five days "after the verdict, or notice of the decision of the court . . ." (See *Dow* v. *Ross,* 90 Cal. 562 [27 P. 409]; *Mullally* v. *Irish-American Benevolent Society,* 69 Cal. 559 [11 P. 215]; 7 Cal. Jur., p. 292, § 32.)

Although knowledge or actual notice is sufficient under Code of Civil Procedure, section 1033, there appears to be nothing in the record which would evidence such knowledge prior to July 9, 1941, the date on which defendants signed the notice of entry of judgment. (See, *Kallmeyer* v. *Poore, supra.*) This being the case, the memorandum was served and filed within the time required by the code, and the motion to strike same was properly denied. Plaintiff argues that when

the judgment was formally entered on July 1, 1941, it then became notice to all parties, and that it must be presumed that defendants had notice on said date. In 1929 section 1033 was amended to require the filing of a cost bill within five days "after entry of judgment"—no reference being made to "notice." This amendment placed upon the successful party the burden of constantly checking the records of the clerk of the court. It was to eliminate this burden that the 1931 amendment was enacted. If notice were to be presumed merely from the entry of the judgment, that portion of section 1033 added by the Legislature in 1931 would be rendered meaningless. Such an interpretation must be rejected.

The judgment and order denying the motion to strike the cost bill are affirmed.

Peters, P. J., and Ward, J., concurred.