[Crim. No. 2623.   First Dist., Div. One.   May 22, 1951.]

THE PEOPLE, Appellant, v. EDWARD A. BEBER et al.,
Respondents.

Fred N. Howser and Edmund G. Brown, Attorneys General, and Clarence A. Linn, Deputy Attorney General, for Appellant.

Marcel E. Cerf, Robinson & Leland, Leslie C. Gillen, John R. Golden and Arthur F. Edwards for Respondents.

WOOD (Fred B.), J.—On March 29, 1949, the grand jury presented an indictment in which the People accused defendants of conspiring to violate the Corporate Securities Act (count I), of violating section 3 of that act by selling shares of a certain corporation without a permit from the State Corporation Commissioner (count II), and of committing grand theft by feloniously taking $20,000, the property of one Harry Randall (count III). The trial court dismissed the indictment. Plaintiff appeals.

In respect to each of the three counts, there are these issues upon this appeal: (1) Were the defendants indicted without reasonable and probable cause? and (2) was the crime charged barred by the statute of limitations?

In count I, defendants Beber, Kobritz and Churchill are accused of violating section 182 of the Penal Code, i.e., that they continuously from January 13 to and including March 30, 1949, willfully, unlawfully and feloniously conspired "to aid in the issue and sale of and to sell and to cause and assist to be issued, executed and sold securities in non-conformity with a permit of the Commissioner of Corporations . . . contrary to the provisions of the Corporate Securities Act . . . and to willfully violate and fail to comply with the provisions of the Corporate Securities Act . . . and to collect, aid in collecting, and make collections of the consideration to be paid on account of subscriptions for sales of stock in a corporation, to wit, Churchill's Frozen Foods, Inc., prior to and before the issuance of a permit of the Commissioner of Corporations . . ." The defendants, this count alleges, committed 12 overt acts in pursuance of the objects of the conspiracy. We are concerned principally with the 7th, 8th, 9th and 12th alleged overt acts, described as follows: That on March 25, 1946, defendants Beber and Kobritz had a con-

versation with Harry Randall and Ed Randall at the office of Allied Produce Company, San Francisco; on March 30, 1946, defendants Beber and Kobritz received and collected $20,000 from Harry Randall; on April 8, 1946, defendants Beber, Kobritz and Churchill mailed to Harry Randall a receipt for $20,000, consideration for 200 shares of stock in Churchill Frozen Foods, Inc., a corporation; and on July 28, 1946, the defendants transported Harry Randall and other persons to Stockton from San Francisco.

It appears from the evidence before the grand jury that Churchill Frozen Foods, Inc., was incorporated March 7, 1946. The first application for a permit for the sale of stock was made April 19th. Supplemental applications or amendments were made April 24 and May 8, 1946. On the latter date a permit was granted.

The permit indicated that the corporation was to take over the business which until then had been conducted as a partnership by Harold F. Churchill, A. Schapiro and Edmund Nies under the name of Harold F. Churchill Company; that the company proposed to issue to each of the partners 914 shares of stock; that the corporation proposed to sell 1,500 shares to the public to liquidate the liabilities of the predecessor partnership and to add to the working capital, and 750 shares to certain persons for organization and promotional services. The application showed assets of the partnership were $257,193 and liabilities $191,965. The net worth of the partnership, according to an appraisal made by the appraiser appointed by the Corporation Commissioner, was about $91,000.

The evidence before the grand jury showed that Harry Randall (who had known Kobritz since 1944, and through his brother, Edward Randall, had heard from Kobritz about Churchill Frozen Foods, Inc.) went to see Kobritz at the office of Allied Produce Company, on March 25, 1946. Beber, called in by Kobritz, told Randall in Kobritz' presence that he, Beber, was selling stock in Churchill Frozen Foods, Inc., of Stockton; that the money from the sale of the stock was to be used for the building of a frozen food plant in Stockton and for buying equipment; that in the last four or five years the company made a profit of around $15,000 to $18,000 a year; that by building a plant they would be able to materially increase their profit; that he, Beber, dictated the policy of the company, that is, he told them what to do and what not to do when it came to freezing foods; that no processing of foods was undertaken until orders had arrived

and in that way there was no possibility of loss due to merchandise on hand not being sold; and that the stock was being sold only to certain people and that he, Beber, was buying $10,000 worth of the stock. At this meeting Beber produced a stock subscription agreement which Randall signed, subscribing for 200 shares of stock at a par value of $20,000. Beber told Randall he would like to have payment by the end of the month, and to make the check payable to ''Churchill Frozen Food Corporation,'' and to bring the check down to Beber and if the latter was not in to leave it with Kobritz.

On March 30, 1946, Randall took to Beber's office a check for $20,000, payable to Churchill Frozen Foods, Incorporated, and signed by Harry Randall as drawer. Beber was not in, so Randall gave it to Kobritz. Kobritz accepted the check and said to Randall, ''I'll see Mr. Beber gets it, and you will get a receipt in a few days.'' Three or four days later, Randall received a receipt, on the letterhead of Harold F. Churchill Company, bearing the signature of Mr. Schapiro. Randall's check was endorsed by Harold F. Churchill, was deposited in the Bank of America at Stockton on April 2, 1946, and was paid by the drawee bank on April 4th. On or about May 16th, Randall received a certificate of stock of the corporation.

In June, Kobritz told Randall that things with respect to the corporation were coming along very nicely. In July, 1946, Randall and his brother were taken to a stockholders' meeting in Stockton. They were notified of this meeting by Beber through Kobritz. They went to Stockton in Beber's car. Randall met Churchill for the first time at this meeting.

Count I of the indictment also alleged the commission of certain overt acts in connection with the sale and issuance of shares of the same corporation to Philip Krieg and to George S. Helms. With reference to those transactions, the evidence before the grand jury indicated that early in 1946 Kobritz told Philip Krieg how good the produce business was, that he had changed from the company he used to work with to another and that they were doing a fabulous business; that his four partners would invest $10,000 each in some frozen food business and if they had their own freezing plant they could save a lot of hauling; and that they were going to organize a corporation and build a plant. In February, 1946, Krieg went to Kobritz' office and Beber was called in. Beber showed Krieg a statement of the Harold F. Churchill Company showing profits of from 25 to 27 per cent.

Beber said he was going to invest $10,000 in the company. No mention was made of any indebtedness of the company. Beber produced a stock subscription agreement and asked Krieg if he wanted to subscribe for some stock. Krieg subscribed for 50 shares. Kobritz was present during the entire conversation. Beber and Kobritz said the money from the subscriptions was to go to build a new plant in Stockton. Beber's name was on the list as subscribing for 100 shares. Beber told Krieg he would let him know later as to how the shares were to be paid for. On March 7th, Kobritz telephoned Krieg, asking if he could come to the office and bring a check. Krieg did so and signed it and gave it to Kobritz, who took it to Beber's office. About a week later, Krieg received a receipt on the letterhead of the Harold F. Churchill Company. Sometime in May, 1946, he received through the mail a stock certificate bearing date May 21, 1946. Krieg, with Randall, went to Stockton in July, 1946, in Beber's car to see the new plant, which Krieg described as follows: ''And there was a shed there, a shed about a hundred feet long, but there was only the frame up, the trusses, and part of the roof was on. The roof was aluminum, corrugated aluminum sheets and sides, maybe 20 or 30 feet was up. There was no new machinery, but they showed us a base where a freezer was going to stand, the motor was going to stand, a cast block concrete base. Outside of that there was nothing done, you couldn't see anything where the money went, yet. But, it was war time yet, and they said we had to have a priority, that many things was very hard to get, but they plant would be complete in a short while.''

George S. Helms had a conversation with Kobritz in regard to Churchill Frozen Foods, Inc. Kobritz told him of a plan to erect a cold storage plant and that $300,000 was needed to do it. Helms asked if he could invest and Kobritz told him to see Beber. Helms saw Beber in February, 1946, and Beber told him $300,000 was needed to build a cold storage plant; that the three partners of Allied Produce Company were each putting up $10,000, and that he, Beber, had subscribed to $10,000 in stock of Churchill Frozen Foods, Inc. Two or three days later, Helms signed a subscription agreement for $2,500 of that stock. Ten days or two weeks later, Beber asked for the money. On March 12th, Helms obtained a cashier's check for $2,500, which he delivered to Beber that day or a day or two later. Within 10 days Helms received an undated receipt, on the letterhead of Harold F. Churchill

Company, signed by A. Schapiro. In the latter part of May, Helms received a certificate of stock in the mail. He was told nothing of the indebtedness of Churchill Frozen Foods, Inc.

Each of the checks delivered respectively by Randall, Krieg, and Helms was endorsed by Harold F. Churchill and deposited in the Stockton branch of the Bank of America to the credit either of Harold F. Churchill Company or of Churchill Frozen Foods, Inc.

A statement of stockholders of the company as of October 31, 1946, showed a certificate issued to Abraham Schapiro for $39,100 par value of stock "Issued for consideration other than cash." This certificate was surrendered and the stock reissued, $13,100 par value going to Schapiro, $13,000 to Beber, and $13,000 to one Earl L. Johnson, and no cash sale was shown by the corporation to Beber.

This evidence was sufficient to support the accusation made in count I that defendants conspired to aid in the issue and sale of and to sell and to cause and assist to be issued, executed and sold securities in nonconformity with a permit of the Commissioner of Corporations of the state and contrary to the provisions of the Corporate Securities Act of the state, and conspired to collect, aid in collecting and make collections of the consideration to be paid on account of subscriptions for sales of stock in Churchill Frozen Foods, Inc., a corporation, prior to and before the issuance of a permit of the Commissioner of Corporations. The evidence shows that they did sell or assist in the sale of shares of stock of a corporation in the absence of a permit therefor, acts proscribed by section 18 of the Corporate Securities Act (2 Deering's Gen. Laws, Act 3814) as it existed in 1946. The manner in which these three sales transactions were handled furnished a basis for the inference that Kobritz in finding a prospect and bringing that prospect to Beber, Beber in giving a sales talk and getting the signature and forwarding the check to Churchill, and Churchill in endorsing and depositing the check, were working together in furtherance of a conspiracy or agreement between them for the accomplishment of the purposes described in count I of the indictment. This evidence furnished the grand jury reasonable and probable cause for believing that the crime described had been committed, and that it had been committed by these defendants. ■ As stated in section 921 of the Penal Code, "The grand jury ought to find an indictment when all the evidence before them, taken together,

if unexplained or uncontradicted, would, in their judgment, warrant a conviction by a trial jury.'' It is the function of the grand jury, not of the courts, to determine whether or not the accusation should be made. A court may not substitute its judgment as to the weight of the evidence. (See *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 55, 57 [216 P.2d 859]; *Weber* v. *Superior Court*, 35 Cal.2d 68, 69 [216 P.2d 871]; *Mold* v. *Superior Court*, 35 Cal.2d 73 [216 P.2d 874]; *People* v. *Nagle*, 25 Cal.2d 216 [153 P.2d 344].)

██ Respondents contend that the three-year statute of limitations had run against the offense charged in count I of the indictment, prior to the filing of the indictment on March 29, 1949. Their theory is that when Harry Randall signed the subscription agreement on March 25, 1946, a sale of stock to him was fully consummated and on that day the statute of limitations commenced to run. They rely principally upon *People* v. *Twedt*, 1 Cal.2d 392 [35 P.2d 324]. In that case it appeared that Twedt was president of a certain corporation and negotiated the sale of stock thereof to one. Kloster. He made her three successive offers, each of which she rejected. Finally, by letter of May 17 she offered to purchase a number of shares at a certain price, if she could pay for them on May 20th. He accepted this offer by letter dated May 18 and postmarked May 19. The court considered that the sale was consummated upon the mailing of Twedt's letter of acceptance, this exchange of letters having constituted the first time that the minds of the parties met on the transaction. If his acceptance was mailed on the 18th, the statute had run; if on the 19th, it had not run. The court sent the case back to the trial court to ascertain which was the date of mailing. On the first trial, the court had treated May 20 (the day on which the subscriber mailed Twedt the consideration for the stock) as the date when the crime was committed. The Supreme Court deemed that erroneous, upon the ground that ''The sending of the money was not a necessary part of the making of the contract, any more than the delivery of the stock, which did not take place until June'' (1 Cal.2d, at p. 399). That decision is not applicable here, because in this case it does not appear from the evidence before the grand jury whether the document which Randall signed on March 25, 1946, was in the nature of an offer by him to buy stock, or an offer from the corporation to him which upon his signing became a contract of sale. If the subscription agreement signed by Randall on March 25, 1946, was

but an offer on his part, acceptance of that offer by the corporation would be necessary to bring into existence a contract of sale. Receipt of the consideration on March 30, 1946, may have constituted such acceptance if Beber was thereunto authorized by the corporation, or acceptance may have occurred on April 2d, when Churchill endorsed the check and deposited it in bank to the credit of the corporation, or some three or four days after March 30th, when a receipt for the $20,000 was mailed to and received by Randall. By one of those dates a sale quite clearly was effected. The mere fact that the evidence does not show to a certainty the precise date of the making of a contract of sale does not render the indictment insufficient or fatally defective.*

Even if the subscription agreement which Randall signed on March 25, 1946, became a contract of sale upon his signing, it is possible that the terms of the contract were such that the shares of stock which Randall was purchasing would not be deemed "issued" until he paid, and the corporation received, the consideration for the shares purchased by him. If that were the true import of the agreement of sale, it follows that the stock was issued at no time earlier than March 30, 1946, and hence within the three-year period prior to the presentation of the indictment. Respondents invoke *People* v. *Twedt, supra,* 1 Cal.2d 392, as holding that once a "sale" is effected the statute begins to run. That was correct under the indictment involved in that case, which charged, in three separate counts, an offer for sale, a negotiation for sale, and a sale. It did not charge, as does count I of the indictment in the present case, a conspiracy to aid in the "*issue* and sale of" and "to sell and to cause and assist to be *issued,* executed and sold" securities in violation of the Corporate Securities Act. (Emphasis added.) ■ The issuance of shares of stock of a corporation means the act or contract of the corporation by which shares become vested in a person as a member or stockholder. (*Blythe* v. *Doheny,* 73 F.2d 799, 803; approved in *Domestic & Foreign Pet. Co., Ltd.* v. *Long,* 4 Cal. 2d 547, 554 [51 P.2d 73].) ■ The time when a share of stock originally comes into existence, and is deemed issued, is controlled by the intent of the parties and is ascertained by

---

*A possible additional distinguishing feature of the Twedt case is the fact that, although the subscriber's check for the money was mailed from Fresno on May 20th, it was not received and cashed by Twedt at San Francisco until May 21st, which happened to be the very day the corporation commissioner issued his permit.

examining the contract which they have executed concerning such issue. (See *Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241, 269-70, 274-75 [65 P.2d 42]; *Hertz Drivurself Stations* v. *Ritter* (C.C.A., 9th Circ.), 91 F.2d 539, 541.) In the Hertz and Robbins cases, it was found, in accordance with the intent of the parties, that title to the shares did not pass until delivery of the certificates. Upon the other hand, in *Mitchell* v. *Beckman*, 64 Cal. 117 [28 P. 110], it was found, upon the basis of the contract there involved, that title to the stock passed even before payment of the consideration, the court saying: "When the corporation has agreed that a person shall be entitled to a certain number of shares in its capital, to be paid for in a manner agreed upon, and that person has agreed to take and pay for them accordingly, he becomes their owner by a valid contract made upon a valuable consideration." (P. 121.) In *Garretson* v. *Pacific Crude Oil Co.*, 146 Cal. 184 [79 P. 838], the court found that certain shares had issued when the consideration therefor was received by the corporation, the court saying, at page 188: "The fact that the Corbin shares were not issued until after other shares had been issued is immaterial, for the Corbin stock passed upon the completion of the agreement by which the consideration was conveyed to the corporation. Nothing remained to be done but the formal issuance of the certificate upon which the ownership of the stock did not depend." ▪ The fact that the certificate of stock was executed and delivered to Randall after the receipt of a permit from the state did not give validity to acts done prior to the issuance of the permit. (*Miller* v. *California Roofing Co.*, 55 Cal.App.2d 136 [130 P.2d 740]; *Bourke* v. *Frisk*, 92 Cal.App.2d 23 [206 P.2d 407].)

Furthermore, we do not interpret *People* v. *Twedt, supra,* 1 Cal.2d 392, as necessarily holding that there can be no set of circumstances under which the collection of the proceeds of the sale of a security is proscribed by the Corporate Securities Act. In that case the inquiry was limited by the wording of the indictment which, at most, narrowly charged that Twedt "offered for sale" and "negotiated for the sale of" and "sold" certain securities. There was no allegation concerning receipt or collection of the proceeds of the sale by Twedt or the corporation, and the court predicated its discussion upon the definitions of "agreement for sale" and "agreement to sell and buy" appearing in sections 1726 and 1729 of the Civil Code, adopting portions of an opinion previously rendered in the

case by a district court of appeal. The Corporate Securities Act in 1946 defined "sale" and "sell" as including "every disposition, or attempt to dispose, of a security or interest in a security for value." (§ 2(a)8.) The collection of the "value" for which a security is disposed would seem proscribed by section 18 of the act when it imposes a penalty upon any person who knowingly "aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed or sold" a security in nonconformity with a permit or contrary to the provisions of the act. The fact that section 2 of the act declares that "sale" or "sell" shall *also include* a "contract of sale, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, subscription or an offer to sell" does not render innocuous the proscribed "disposition . . . of a security . . . for value" which seems to be the main feature of the act. ▮ We are of the view that when appropriately put in issue by the pleadings the receipt (in the absence of a permit) of the consideration specified in a contract for the sale of stock is a public offense under the act. This court was of this view in 1942 when, in *Miller* v. *California Roofing Co., supra,* 55 Cal.App.2d 136, we said, "the plaintiff having parted with and the defendant corporation having accepted the sum of $2,500 in pursuance thereof, without a permit, the defendants were guilty of a public offense" (p. 141), and in 1949 when, in *Bourke* v. *Frisk, supra,* 92 Cal.App.2d 23, this court said, "In the latter cases money was paid, an essential part of the sale, at a time when there could be no valid sale" (p. 31). In the instant case, count I expressly charges as one of the objects of the alleged conspiracy that defendants conspired "to collect, aid in collecting, and make collections of the consideration to be paid on account of subscriptions for sales of stock in a corporation, to wit, Churchill's Frozen Foods, Inc., prior to and before the issuance of a permit . . ." This was supplemented by the allegations, among others, that on or about March 30, 1946, in pursuance of the object of the conspiracy, defendants Beber and Kobritz received and collected from Randall the sum of $20,000; that on or about April 2, 1946, defendant Churchill received, collected and accepted from Randall the sum of $20,000; and that on April 8, 1946, defendants Beber, Kobritz and Churchill caused to be sent to Randall by mail a receipt for $20,000 for 200 shares of stock in Churchill Frozen Foods, Inc., a corporation. Here, there was no failure, as there appears to have been in the Twedt case, to plead specifically and

in sufficient detail the ''for value'' feature of the transaction by which ''disposition'' was made of stock to Randall.

We conclude that count I was not barred by the statute of limitations. The contract of sale to Randall and the issuance of stock to him may well have occurred within the three years. The receipt and collection of the consideration for the stock sold, according to the evidence before the grand jury, took place well within the three-year period.

Count I should not have been dismissed.

In count II, the People accuse defendants of selling to Harry Randall on or about March 30, 1946, 200 shares of Churchill Frozen Foods, Inc., for $20,000, and allege that said stock was then and there offered to the public for sale and sold to Randall by defendants without defendants or anyone else having first applied to or obtained a permit therefor from the Corporation Commissioner of the state, and in violation of section 3 of the Corporate Securities Act. The reference to section 3 is an obvious error, for that section deals with the sale by the company issuing the stock, which this alleged transaction clearly was not. The offense alleged in count II is really a violation of the provisions of section 18 of the act. Therefore, the erroneous reference to section 3 does not render this count defective. (See *People* v. *Aresen*, 91 Cal.App.2d 26, 36 [204 P.2d 389, 957].)

We have already given a summary of the evidence before the grand jury which supports the accusation made in count I. Much of that evidence is relevant to and supports the accusation made in count II. That evidence furnished the grand jury reasonable and probable cause for believing that the crime described in count II was committed and that it was committed by these defendants.

As to the statute of limitations, if the subscription agreement signed by Randall on March 25, 1946, was but an offer (not the acceptance of an offer) by him, then the contract of sale was consummated at a later date and within the three-year period of the statute of limitations.

We conclude that count II should not have been dismissed.

In count III of the indictment, the People accuse defendants of committing grand theft on or about March 30, 1946, by willfully, unlawfully and feloniously taking $20,000 in money, the personal property of Harry Randall. The evidence before the grand jury was insufficient to support this accusation. It amounted, at most, to representations by the defendants to Randall that the money received for the

stock would be used for the building of a frozen food plant in Stockton and for buying equipment. That evidence also showed that in July a building was in course of construction but that it was wartime yet and many things were hard to get. That is not evidence that the defendants were not faithfully endeavoring to make good on the representations made by them when they sold the stock to Randall. The only other representation was by Beber to the effect that he was buying $10,000 worth of stock. It appears that he did receive $13,000 par value of stock, apparently, or inferentially, through some interest of his in the business and assets acquired by Churchill Frozen Foods, Inc. Especially was there lack of evidence before the grand jury that any of the defendants, at the time they made any of these representations, had no intention of carrying them out or seeing them accomplished. Count III was properly dismissed.

The portion of the order dismissing count III is affirmed; that portion of the order dismissing count I and count II of the indictment is reversed.

Peters, P. J., and Bray, J., concurred.