[Civ. No. 14537. First Dist., Div. One. Nov. 29, 1951.]

HARRY RANDALL et al., Appellants, v. EDWARD BEBER et al., Respondents.

Jaffa & Sumski for Appellants.

Marcel E. Cerf, Robinson & Leland for Respondents.

WOOD (Fred B.), J.—Plaintiffs Harry Randall and Edward Randall appeal from the judgment rendered against them and in favor of all of the defendants in an action brought by them for damages allegedly caused by the sale to them of 200 shares, at $100 per share, of the capital stock of Churchill's Frozen Foods, Inc., a corporation.

The complaint states two causes of action for damages; one predicated upon the asserted statutory liability of each of the defendants, and the other against defendant Beber, alone, for his alleged fraud and deceit in the sale of these

shares to plaintiffs. The trial court found against the plaintiffs upon each cause of action.

*The asserted statutory liability* of the several defendants to the plaintiffs turns, principally, upon the question whether or not there was a "sale" prior to the granting by the State Commissioner of Corporations of a permit for the issuance of the shares, and, if so, whether or not the defendants knowingly authorized, directed or aided in the sale of those shares, or caused or assisted in causing them to be sold. The defendants are Harold F. Churchill, A. Schapiro, and Edward Beber, individually, and Harold F. Churchill Company, a partnership consisting of Harold F. Churchill and Edmund E. Nies, general partners, and A. Schapiro, limited partner.

The following significant facts appear without conflict in the evidence: The members of defendant Harold F. Churchill Company decided to incorporate for the purpose of expanding and improving the business of the partnership, that of processing and freezing fruits and vegetables at Stockton. In February, 1946, a preincorporation stock subscription agreement was prepared at the instance of Churchill and forwarded by him to Schapiro, for use in San Francisco. The agreement recited a proposal to incorporate and apply for a permit to issue stock and declared that the undersigned agreed with each other and with the proposed corporation that they severally subscribed for the number of shares set opposite their names and would pay par value therefor, upon the conditions that the corporation be incorporated "within _____ days" and would with reasonable diligence secure from the State Commissioner of Corporations a permit "authorizing the issuance of the shares of stock conditionally subscribed for herein." The corporation was formed March 7, 1946, with the name Churchill Frozen Foods, Inc. In the latter part of March, 1946, Harry Randall signed the stock subscription agreement, undertaking to purchase 200 shares of stock at $100 per share, and delivered to one Richard G. Kobritz his check dated March 30, 1946, for $20,000, payable to Churchill's Frozen Foods, Inc. (Randall testified he did not read the text of the agreement. We find in the record no evidence that either of the plaintiffs read or was informed of any of the provisions of the agreement, other than that it was a subscription agreement.) This check was transmitted to Churchill. On or about April 3, 1946, it was endorsed in the name of the corporation by Churchill as president and deposited by him in a special bank account in the name of the

corporation. A receipt signed by Schapiro, reading, "Received from Harry Randall $20.000.—dollars for 200 (two hundred) shares of stock in Churchill's Frozen Food, Inc. HAROLD F. CHURCHILL COMPANY. [Signed] A. Schapiro," was mailed to and received by Randall a few days after March 30, 1946. Churchill was president and a director of the corporation from March 18 to December 13, 1946; Schapiro was vice-president from March 18 to November 12, 1946, and a director from March 18 until after December 16, 1946. The board consisted of three members until July 15, 1946, when it was increased to seven. The partnership assets were turned over to the corporation on March 31 and the corporation began to operate as a corporation on April 1, 1946.

Not until April 19, 1946, was an application made to the Commissioner of Corporations for a permit for the issuance and sale of shares of its capital stock by the corporation. The applicant requested permission to issue a certain number of shares of its stock in exchange for the business and properties of the Churchill partnership, and to sell 1,500 shares at par for cash to the public. It made no mention of the preincorporation subscription agreement or of the fact that any subscriptions had been made. It stated that no time had been fixed to commence to sell its securities, that it proposed to sell them upon the issuance of a permit therefor.

The permit, issued May 8, 1946, authorized the corporation to sell and issue not exceeding 1,500 shares at par for cash, after it had issued the shares to the Churchill partners and received the consideration therefor. The permit was issued upon the express condition "That a true copy of this permit be given to each subscriber prior to the taking of his subscription and to each purchaser prior to the sale to him of the securities permitted to be issued."

The minutes of a meeting of the board of directors of the corporation held May 15, 1946, contain the following statement: "President Churchill reported that heretofore under the provisions of a certain Subscription Agreement, certain individuals had subscribed to 810 shares of the capital stock of this corporation to be issued to them upon the incorporation of this corporation. That the Subscription Agreement was presented to the meeting and filed with the Secretary; said Subscription Agreement indicating the names of the subscribers, the date of the subscription and the number of shares subscribed to respectively by the persons signing said agreement. President further stated to the meeting that it was

appropriate at this time to comply with the terms of said agreement and cause to be issued to said subscribers, the number shares of the capital stock of this corporation so subscribed by each of the said parties to said agreement. That said Subscription Agreement is hereby made a part of the minutes of this meeting and reference is hereby made thereto for the names of the subscribers and the number of shares subscribed by each." Then follows a resolution that day adopted by the board. It recites that on January 24, 1946, and subsequent thereto, certain individuals subscribed to the number of shares of the capital stock of the corporation set forth in said subscription agreement and at the time of the subscription deposited in trust $100 for each share of stock so subscribed, and that the corporation has secured the permit referred to in said agreement, authorizing the issuance of the shares conditionally subscribed for in the agreement. The resolution then directs the president and secretary to issue and deliver certificates evidencing the number of shares of stock subscribed to by each of said subscribers, in consideration of the delivery to the corporation of $100 per share, "being stock authorized by said Permit," and directs that a copy of the permit be delivered at once to said subscribers.

Stock Certificate No. 9, dated May 15, 1946, evidencing the ownership of 200 shares of the corporation by Harry and Edward Randall, was mailed to them May 17, 1946, with a letter of transmittal bearing the signature of Churchill as president of the corporation. This letter recited, also, the enclosure therewith of a copy of the permit and a copy of the resolution of the board of directors. (An employee of the corporation testified that he enclosed copies of the permit and the resolution with each letter transmitting a stock certificate. Harry Randall testified he did not receive a copy of the permit with his certificate. We do not find in the record any evidence that the matter of a permit, and its issuance or not, was orally mentioned to either of the plaintiffs.) The evidence most favorable to the defendants concerning the circumstances under which the plaintiffs subscribed for these shares, and paid the consideration therefor, was furnished by the testimony of defendants' witness Richard G. Kobritz. He testified that he and the Randalls were neighbors and that he knew Ed Randall very well; that Ed visited at Kobritz' home frequently and they would often discuss finances and investments, and that Ed told him one time that if Kobritz heard of any good investments to let him know. In

February, 1946, Kobritz heard about the pending Churchill expansion, and one evening when Ed Randall was at his home Kobritz told Ed he had heard of the expansion and that it looked like a good thing. There were four or five more discussions about the matter and then Ed told Kobritz that he and his brother would be interested in investing $10,000 in the Churchill corporation, whereupon Kobritz made an appointment at his office for the Randalls to meet defendant Beber. The meeting was held at the office of the Allied Produce Company, a partnership engaged in the food brokerage business, its members consisting of Kobritz, Beber, Earl B. Johnson and Charles Arata. Beber told the Randalls that the Churchill Packing Company intended to expand its operations; that he, Beber, intended to take some stock in the company, as also did his partners Arata and Johnson, and others. He explained to them the future of the frozen food industry and said it looked to him like a good thing but they did not have to take his word for it, advising them to go and see the Kelley-Clarke Company, broker for the Churchill company, giving them that firm's address. Beber told them that the Churchill company had been making money in previous years and intended to expand in order to increase its production. No paper was signed by either of the Randalls during that interview. One of the Randalls said, ''When shall we pay for this stock?'' and Beber said ''Whenever you are ready.'' About a week later, Harry Randall brought the $20,000 check and delivered it to Kobritz, who gave it to his partner, Johnson. Johnson then gave Kobritz some kind of a paper for Randall to sign, which Kobritz brought in to Harry Randall who signed it, and then Kobritz gave it back to Johnson. Kobritz saw several other people bring in checks, Arata handed several checks over to Johnson, and Johnson handled the mailing of these checks to the Churchill company. The witness thought Johnson had a portfolio of everything pertaining to the Churchill company.

This was not an isolated transaction. Churchill testified that some 10, 12 or 15 persons signed the subscription agreement, including Churchill, Nies, Schapiro, Beber, Johnson, Arata, one of the Randalls, Krieg, Helms, and Bevanda. Among the subscribers who testified, Phillip Krieg said he first heard of the deal through Kobritz and met Beber through Kobritz at the office of Allied Produce Company; that Beber told him about the profits made by the Churchill partnership and that the money was going to be used to put up a freezing

plant; that Beber showed Krieg a subscription list, with Beber's name at the top, and Krieg signed for 50 shares, which he thereafter paid for by check of March 7, cashed March 21, 1946. George S. Helms testified that he asked Kobritz if there was a chance to invest and was referred by Kobritz to Beber, who described the project and said he was going to invest $10,000 himself, and that Helms signed up, delivering a check therefor to Beber, a check dated March 12, 1946. Beverly O. Brace, another subscriber, discussed the matter with Beber, Johnson and Arata. Jack Patrick talked the matter over with Arata. Eugene J. Marty heard about it in March, 1946, talked to Johnson and sent a check, dated April 1 and paid April 17, 1946, to Johnson. Charles H. Kispert talked to Johnson, Beber and Arata, and in March, 1946, delivered his check to Johnson. Milton Levy, an employee of Allied Produce Company, invested in March or April, 1946, and delivered his check to Beber. Most of these subscribers had known either Johnson, Beber, Arata, or Kobritz for some years.

Schapiro testified that he was the representative officer of the corporation in San Francisco (the principal office of the corporation was in Stockton); that at his request receipts similar to that which Harry Randall received were prepared in Stockton and sent to him; that he signed them in blank and left them in his desk in the offices of Allied Produce Company for use when stock was sold; that he was acting as vice-president of the corporation at the time of signing; at the time of signing he did not know in what name the funds were going to be deposited prior to issuance of the stock (although the name used in the receipts was that of the partnership, it was also the name by which the proposed corporation was designated in the subscription agreement); that all the partners of Allied Produce Company had access to his desk; that he expected most of the stock to be sold in San Francisco; that there was no direct authorization to anybody to sell the stock but he did make them understand that if they did sell any stock, or if anyone sold any stock, they could use one of the receipts he had signed in blank; that he signed the receipts in blank for the reason that the corporation commissioner had not yet given permission to issue the stock; that it was a sort of temporary receipt until the stock was to be issued. Asked if the partners in Allied Produce Company were supposed to sell the stock, he said, ''I don't know who was supposed to sell it. We were all going to go out

and see if we could find subscribers to the stock." He knew that Mr. Johnson and Mr. Arata found subscribers to the stock. Churchill testified that prior to April 17, 1946, he received in the neighborhood of $70,000 or $75,000 for stock in the corporation, which he originally deposited in a special bank account in the name of the corporation, and that, eventually, this was all drawn out of that account when the permit was issued, and was placed in a general account of the corporation.

Schapiro testified that the corporation paid no dividends and went into bankruptcy January 2, 1947, and that the stockholders would receive nothing of value. The Randalls testified they had received no dividends on the stock, and nothing of value.

These facts demonstrate that a sale of 200 shares of the capital stock of the corporation was made to the plaintiffs when they subscribed for them and paid the purchase price to the corporation in late March and early April, 1946, prior to the issuance of a state permit therefor. "Sale," as used in the Corporate Securities Act at the time of this transaction, included "every disposition, or attempt to dispose, of a security . . . for value," also "an attempt to sell, an option of sale, a solicitation of a sale, subscription or an offer to sell, directly or by an agent, or a circular letter, advertisement or otherwise" (Corp. Sec. Act, § 2, as amended by Stats. 1945, pp. 853-854).

The acts of the president and vice-president, each a director, of the corporation, in planning the sales and in furthering this sale, and the receipt of the purchase price for and its deposit in bank in the name of the corporation, would support a finding that the corporation made this sale. Such a sale is proscribed by the Corporate Securities Act. "No company shall sell any security, except upon a sale for a delinquent assessment against such security . . ., or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do" (Corp. Sec. Act, § 3, as amended by Stats. 1941, p. 2064). This subscription, although in terms a preincorporation subscription agreement, was not within the sanctions accorded by section 33 of the act. That section permitted only subscriptions "made prior to the incorporation" of the corporation, and did not permit "the collection of any portion of the consideration to be paid on account of such subscriptions, unless and until a permit shall

have been issued by the commissioner authorizing such collection'' (Corp. Sec. Act, § 33, as added by Stats. 1931, p. 958).

The evidence of the activities of the defendants in furthering this sale, and other sales, would support a finding that they knowingly authorized, directed, or aided in this sale or assisted in causing it to be made.

The statute imposes penalties upon a corporation making such a sale, and upon each person who knowingly authorizes, directs, or aids in the sale. ''Every company which shall directly or indirectly offer for sale, or negotiate for the sale of or sell, or issue, or cause to be issued any security contrary to the provisions of this act, . . . shall be guilty of a public offense and shall be punishable by a fine not exceeding ten thousand dollars'' (Corp. Sec. Act, § 17, as amended by Stats. 1931, p. 950). ''Every officer, agent, or employee of any company and every other person, who knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this act, . . . is guilty of a public offense and shall be punished by imprisonment . . . or by a fine . . . or by both . . .'' (Corp. Sec. Act, § 18, as amended by Stats. 1931, p. 950).

From the imposition of these penalties in such a statute, a legislative intent to void the proscribed ''sale'' is inferred.

This illegality infects the final act in the transaction, the issuance of the shares of stock, even though that act occurs after the issuance of a state permit, if that act stems directly from the illegal sale without any intervening circumstance such as the making of a new agreement between the parties after issuance of the permit and in accordance with its terms. It is the validity of the sale, not the validity of the shares or their issuance, which is the crucial question. The collection of the money, a significant part of a sale for value (*People* v. *Beber*, 104 Cal.App.2d 359, 369 [231 P.2d 516], and cases cited), occurred at a time when there could be no legal sale. The corporation actively participated in this transaction, made a ''sale,'' at least as early as the date when it received, accepted, and deposited the purchase price check. The illegality which attached to and inhered in this sale prior to obtaining a permit, could not be removed, cured, or rendered innocuous by issuance of the shares after obtaining a permit, if such issuance was based upon and stemmed directly from the illegal sale without any intervening circumstance to break

the chain. That is this case. Nothing occurred between the plaintiffs and the defendants or the corporation concerning these or any shares of stock of the corporation after payment and receipt of the money and the issuance and delivery of the stock certificate. The very minutes of the May 15 meeting of the board of directors demonstrate that the issuance of the shares was based upon the subscription agreement and the receipt of the money. For all practical purposes, the action taken by the board of directors on May 15 was a formal confirmation of the corporation's prior collection of the consideration, and approval and acceptance of the subscription agreement made for its benefit. The illegality which tainted this transaction prior to the issuance of the permit tainted the entire transaction. As said by this court in *Bourke* v. *Frisk*, 92 Cal.App.2d 23, at page 31 [206 P.2d 407], "Such essential part being tainted with illegality infected the entire transaction and completion of the sale by issuance of the shares at a later time could not make it valid." (See, also, *Miller* v. *California Roofing Co.*, 55 Cal.App.2d 136, 141-142 [130 P.2d 740].)

In such a case the law does not necessarily leave the parties to the illegal contract where it finds them. The applicable statute was designed for the protection of the public. Its penalties run against the corporation and those persons who participated with it in making a "sale" contrary to its provisions, not against a member of the purchasing public. If such a purchaser is not *in pari delicto*, the law accords him relief against the corporation and against any person who aided the corporation in making the sale or participated in the general scheme to sell securities. (*Mary Pickford Co.* v. *Bayly Bros., Inc.*, 12 Cal.2d 501, 514-516 [86 P.2d 102].)

 Mere knowledge that no permit has been issued does not necessarily bring a purchaser *in pari delicto*. (*Idem.*, p. 516.)

 When the purchaser's action is for damages (as in this case), such a participant need not have received any of the consideration paid for the stock. (*Randall* v. *California L. B. Syndicate*, 217 Cal. 594, 598-599 [20 P.2d 331], distinguishing *Pollak* v. *Staunton*, 210 Cal. 656 [293 P. 26], which was an action for money had and received.)

We will now consider the findings which the trial court made, based upon the evidence which we have summarized.

The trial court found: (1) Churchill was president of the corporation from March 18 to December 13, 1946; Schapiro, vice-president from March 18 to November 12, 1946; (2) the

corporation did not between March 18 and April 3, 1946, sell 200 of its shares to plaintiffs; on March 30, 1946, plaintiffs at their own request signed a preincorporation subscription agreement, subscribing for 200 shares conditioned upon the corporation securing a permit authorizing issuance of the shares conditionally subscribed for, knowing that no such permit had issued; no statement by any defendant was made to plaintiffs that any such permit had issued; the corporation was not a party to said agreement, the only parties being the persons signing it; (3) plaintiffs did not at the request of the corporation deliver a check in the sum of $20,000 to the corporation; about April 2, 1946, plaintiffs received an instrument in the form of Exhibit B attached to the complaint [the receipt to Harry Randall, signed by Schapiro, for the $20,000]; at the time of signing the agreement, plaintiffs, with full and equal knowledge with the other parties thereto that no permit had been issued, delivered a check for $20,000 in the form of Exhibit A attached to the complaint [payable to the corporation]; *the check was deposited by the corporation* in a trust account specially maintained for the deposit and holding of funds paid by said subscribers pending the issuance of the stock conditionally subscribed for; plaintiffs' money remained on deposit until after the issuance, receipt and acceptance of their stock; (4) April 19, 1946, the corporation filed an application for a permit for the sale and issuance of its capital stock; on May 8, 1946, a permit was issued by the Commissioner of Corporations, requiring that a copy thereof be given each subscriber or purchaser prior to sale; (5) May 15, 1946, the board of directors of the corporation adopted a resolution directing that stock certificates be issued to "said subscribers in consideration for the delivery to the corporation of $100 each for each share so subscribed for," and directing that a copy of the permit be delivered at once to "each of said subscribers"; (6) May 17, 1946, an employee of the corporation enclosed and mailed, by registered mail, to plaintiffs, the certificate for 200 shares and a copy of the permit, which plaintiffs received and examined May 18, 1946; a copy of the permit was shown and given the plaintiffs prior to the sale of said stock to them; (7) continuously from April 2, 1946, and at the time of the "tender of the stock to plaintiffs by said corporation" and the acceptance thereof by plaintiffs and until more than a reasonably sufficient time within which plaintiffs could have refused to accept the stock and have returned it and demanded return of their money and taken other steps to rescind, cancel or withdraw said conditional

subscription, the $20,000 remained on deposit in the trust account; the conduct of plaintiffs comprised an agreement to purchase unconditionally said 200 shares so tendered by the corporation pursuant to said conditional subscription; (8) said sale occurred at the time of the receipt and retention of the stock by the plaintiffs; prior thereto there was no agreement on the part of the corporation with plaintiffs to sell or issue stock to them; the sale was not made prior to the issuance of a permit, nor in violation of the Corporate Securities Act, nor was it void; (9) April 11, 1947, the corporation was adjudicated a bankrupt; plaintiffs still have the shares and have received no dividends or other return on said shares, which are worthless, but at the time of plaintiffs' receipt and acceptance thereof the shares were reasonably worth the price paid therefor; (10) after accepting and retaining the stock, plaintiffs participated in the affairs of the corporation and received statements concerning its condition and earnings, without objection on their part.

Concerning the part played by the defendants in this transaction, the trial court found: (11) None of the defendants participated in making a sale of 200 shares of the stock of the corporation to plaintiffs between March 18 and April 3, 1946; none of the defendants conducted any negotiations for, or directed or aided in, said sale or any sale to plaintiffs; Beber was not an agent of the corporation; Beber did not conduct any negotiations resulting in, nor did he participate in making, said sale or any sale; none of the defendants participated in the sale of said stock to plaintiffs prior to the issuance of a permit, nor without giving a copy of the permit to the plaintiffs prior to the sale thereof; (12) none of the defendants received any part of the money or any benefit therefrom except such incidental benefit as plaintiffs and other stockholders received mutually from each other by reason of their community of interest and investment in the corporation.

The finding that plaintiffs' purchase price check for $20,-000, made payable to the corporation and endorsed in the name of the corporation by its president (which the evidence shows was receipted for by Schapiro, acting as vice-president of the corporation), was deposited by the corporation in an account specially maintained for the deposit and holding of funds paid by plaintiffs and other subscribers pending the issuance of the stock that had been conditionally subscribed

for; identifies the corporation with the illegal sale of March-April, 1946.

The finding that the board of directors of the corporation adopted a resolution directing that stock certificates be issued to "said subscribers in consideration for the delivery to the corporation of $100 each for each share so subscribed for," further identifies the corporation with the sale which was made prior to the issuance of a permit.

These findings, coupled with the recitals in the minutes concerning the subscription agreement, demonstrate that in issuing the stock certificates the corporation acted in response to and in acceptance of the offer tendered by the signers of the subscription agreement. As to the plaintiffs herein, nothing happened after the delivery of the purchase price money by them and before the action taken by the board of directors of the corporation at its meeting of May 15, 1946. We find in the record no evidence even of any conversations during that period between either of the plaintiffs and any representative of the corporation, or any of the other subscribers, or any of the defendants herein, concerning the purchase of shares of stock of the corporation. The issuance of the certificates to the plaintiffs stemmed directly from the illegal sale of March-April, 1946, without any intervening circumstance. There is no basis in fact for an inference or a legal conclusion that the issuance and the mailing of the certificate to the plaintiffs was a new, separate and independent offer by the corporation which resulted or could result in a new, separate and independent agreement between the corporation and the plaintiffs upon the reception and retention of the certificate by the plaintiffs. Even the letter of transmittal was not suggestive of a new and independent transaction. It merely recited the enclosure of the stock certificate and copies of the permit and the resolution, directed attention to the fact that the resolution waived all rights for promotional stock to the incorporators, and concluded: "I appreciate, very much, your investing with us and hope you will realize considerable pleasure and profit from the investment." Nor is this a case in which the rights of innocent third parties, such as creditors, have attached. The principles applied in *Moore* v. *Moffatt,* 188 Cal. 1 [204 P. 220]; *Waring* v. *Pitcher,* 135 Cal.App. 493 [27 P.2d 397], and *Robbins* v. *Pacific Eastern Corp.,* 8 Cal.2d 241 [65 P.2d 42], are inapplicable here, for the reasons stated by this court in *Bourke* v. *Frisk, supra,* 92 Cal. App.2d, at pages 29-31.

The finding that the deposit was a "trust account" does not alter the fact that the corporation received the money and had it at its disposal. The very collection of the money was under the ban of the statute.

The findings that the sale occurred at the time of the receipt and retention of the stock by the plaintiffs, that prior thereto there was no agreement on the part of the corporation with plaintiffs to sell, and that the sale was not made prior to the issuance of a permit, are, in reality, erroneous legal conclusions stemming, perhaps, from erroneous application of the concept of "sale" ordinarily used in relation to the sale of personal property, a vastly narrower concept than that used in defining "sale" for the purposes of the Corporate Securities Act.

The finding that the defendants did not participate in making, or directing or aiding in, any "sale" to plaintiffs, obviously is based upon the erroneous legal conclusion that no "sale" occurred prior to the issuance and delivery of the stock certificate. We do not know what the trial court would have found concerning participation by the defendants in this transaction, had the court used and applied the legally applicable definition of the word "sale."

The finding that plaintiffs signed the subscription agreement knowing that no permit had been issued, and did so with full and equal knowledge with the other parties thereto that no permit had been issued, could have been based, at most, upon an inference that Harry Randall read the agreement before signing, despite his testimony that he was told merely that it was a subscription agreement, and that he signed without reading it. There was no testimony that the subject of a permit, or the lack of one, was ever mentioned to either plaintiff, and Kobritz testified that Edward Randall was not present when Harry signed. In view of these circumstances, we do not construe this as a finding that the plaintiffs were *in pari delicto* and for that reason not entitled to recover, especially in the light of the finding that no sale occurred prior to the issuance of a permit and the finding that plaintiffs could have withdrawn their subscription and demanded return of the money prior to their receipt and acceptance of the stock certificate. A right to recover the consideration paid is not a right which the law accords a purchaser who is *in pari delicto,* if the consideration was illegally collected. (*Campbell* v. *Julian Merger Mines,* 111 Cal.App. 649 [295 P.

1040] ; see, also, *Bank of Orland* v. *Harlan,* 188 Cal. 413, 419-422 [206 P. 75], and *Matthews* v. *Lopus,* 24 Cal.App. 63, 68-70 [140 P. 306].) The finding under consideration is not the same as the finding which this court construed in *Miller* v. *California Roofing Co., supra,* 55 Cal.App.2d 136, as a finding that the plaintiff was *in pari delicto.* There, the trial court found that the plaintiff was estopped from asserting against defendants any claim. That, while a wrong designation, was interpreted as a holding that the plaintiff was *in pari delicto.* This court observed that "although the learned court below did not affix the appropriate legal tag, it is plain that he had in mind the doctrine of *in pari delicto.*" (P. 143.) Also, that finding was supported by evidence that the plaintiff was a branch plant manager of the corporation and a relative of one of its directors, and that one of the directors had numerous discussions with plaintiff on the necessity of taking care of legal formalities before a permit to sell stock could be obtained and that no stock could issue until the necessary legal steps were taken.

The finding that the stock, although now worthless, was worth what the plaintiffs paid for it when issued, does not bear upon plaintiffs' statutory right of recovery if other facts established such a right, however appropriate it might be in an action for rescission for fraud or deceit. In such a case as this, the purchaser, if not *in pari delicto,* may bring an action for the damages suffered, measured by the money which he paid or the value of the property which he conveyed for the stock. (*Randall* v. *California L. B. Syndicate, supra,* 217 Cal. 594, 598-599.)

The finding that a copy of the permit was shown and given to plaintiffs prior to the sale of the stock to them, is predicated upon, and falls with, the erroneous finding that no sale took place until plaintiffs received and retained the stock certificate.

The judgment must be reversed and the cause remanded for trial of the issues presented by the first cause of action, based upon the alleged statutory liability of the defendants.

■ *As to the cause of action for damages for the alleged fraud of Beber in the sale of the stock to plaintiffs,* the findings of fact are supported by the evidence. There is a sharp conflict in the evidence concerning the representations made by Beber and the reliance thereon by the plaintiffs. That conflict was resolved by the trial judge, who observed the witnesses and heard their testimony.

The alleged representations were that Beber said (1) that he was going to purchase stock, and that by displaying the subscription agreement which he had signed he represented he was going to buy the stock for cash; (2) that the corporation wanted money to buy refrigeration equipment and that the money paid by plaintiffs would be used therefor. The complaint then alleged that Beber did not buy stock for cash and never intended to, and that the corporation did not intend to use the money for the purchase of refrigeration equipment, did not so use it, and intended to and did use it to pay the existing indebtedness of the corporation or of the Churchill partnership; that Beber knew that these representations were untrue and that the plaintiffs bought their stock in reliance upon said representations.

Kobritz testified that Beber said to plaintiffs, "I understand you intend to come into the Churchill Frozen Foods"; told them how long the company had been in existence, and said he thought they did very well in the business and expected to do even better in the future by expanding their operations, by putting in new equipment; explained the future of the frozen fruit industry and said it looked good to him, like a good thing; that the Churchill company was making money in the previous years and intended to expand in order to develop a larger production. He said he intended to take some stock in the company; did not say how many shares he was going to take. Beber had no papers in his hand during the time he was talking with the plaintiffs and no papers were signed by anybody at that time. Beber had no papers with him that contained signatures of people who were going to buy stock in the company. He had no such document. Beber said he was glad the plaintiffs were coming in as friends of Kobritz but "Don't take my word for it; go see Kelley-Clarke Company," brokers for the Churchill company, who could give plaintiffs any information they desired. Plaintiffs asked for and Beber gave them the address of Kelley-Clarke.

John Chaddock, of Kelley-Clarke, testified that both the plaintiffs came to see him and Robert Dodd in March, 1946; that they discussed the merits and hopes of the Churchill company; that plaintiffs said Beber sent them there or that it was Beber's office they were coming from; that plaintiffs said they were contemplating investing in the Churchill company and wanted to know its merits and its prospects.

Robert F. Dodd, of Kelley-Clarke, testified that plaintiff Edward Randall came to see him and Chaddock. He thought

Harry Randall was also present. Edward said he had been sent by Beber to inquire about the operation of the Churchill company with regard to sales and other items; that he was a prospective investor in the company. Dodd and Chaddock explained the manner of sales procedure in the company and the sales experience they had with the Churchill company, saying that their relations had been excellent, that they always found Mr. Churchill entirely trustworthy and reliable, and their experience had shown that the company had made a profit, which was a fact.

Dodd also testified that the frozen food industry had prospered prior to 1946, but during that year, due to low ceiling prices and credit restrictions, sales dropped and packers were unable to move their products, with the result that many firms went through bankruptcy or were on the verge of it.

These and other facts support the trial court's findings that Beber did not represent that he intended to purchase stock for cash; that the corporation intended to use a portion of the proceeds of the sale of its stock for the purchase of additional machinery and equipment, and entered into contracts for the purchase of the same; that the corporation's business flourished until August, 1946, when the business generally suffered a severe slump from overproduction and shrinkage of bank credit, causing substantial losses to the corporation, bringing about its adjudication as a bankrupt; that the statements which Beber did make to plaintiffs were in good faith, based on information he reasonably believed true, and was true; that those statements were opinions, not representations; that plaintiffs knew and should have known that they were opinions and not representations; and that plaintiffs did not rely upon any of said statements but made and relied upon an independent investigation as to the advisability of investing in stock of the corporation.

That portion of the judgment which decrees that plaintiffs take nothing by the second cause of action of the complaint should be affirmed.

*The denial of plaintiffs' motion to amend the complaint by substituting the names* of Kobritz, Johnson, and Allied Produce Company for certain defendants fictitiously named, is assigned as error.

The motion was made on the last day of the trial and renewed upon written notice about a month later. The notice states that the participation of these proposed parties in the sale to plaintiffs, and their liability to plaintiffs was not discovered until the second day of the trial.

In denying this motion, the trial court found that the identity of Kobritz, Johnson and Allied Produce Company, and their participation in the transaction, was known to plaintiffs prior to the trial, and that plaintiffs did not exercise due or any diligence in taking proceedings to join or bring them in as parties. The evidence supports that finding. The plaintiffs certainly knew Kobritz and the essentials of his participation. It was with him that they principally dealt. The only element of surprise in that regard was his testimony that he delivered the $20,000 check to Johnson, not to Beber. Prior to the trial, plaintiffs were informed by Churchill, upon deposition, that most of the stock was sold by Schapiro or Beber or Johnson, and that Churchill could have received the $20,000 check from Schapiro or Beber or Johnson. Schapiro testified upon deposition that he first saw a document that answered to the description of the subscription agreement in March or April, 1946; it was at Allied Produce Company, he thought it was on Johnson's desk; that Johnson was a member of Allied Produce Company and sold some stock in the corporation; that someone in Allied Produce handed Schapiro the document and he signed it; so far as Schapiro knew, the only persons who sold the stock were the people in Allied Produce; he did not know of anybody who sold besides Johnson; he did not hear of Beber selling any; that Johnson told Schapiro the corporation received around $100,000 for stock sold prior to authorization by the Corporation Commissioner; that Beber received his stock by transfer from Schapiro, in payment of a debt owing from Schapiro ever since the Allied Produce partnership was formed. Plaintiffs' counsel then asked Schapiro if he knew what interest anybody in Allied Produce had in obtaining stock subscriptions, which he refused to answer upon advice of counsel. The asking of that question indicated awareness of active participation upon the part of members of Allied Produce Company.

The trial court further found that the joinder of these persons "at this stage of the proceedings [the conclusion of the trial] would result in hardships and unfairness to the original defendants." That, too, was peculiarly within the province of the trial court to determine. We find no abuse of discretion in the denial of plaintiffs' motion. The fact that the trial court, in its order of denial, expressed the opinion (whether correctly or not) that the evidence in the case did not furnish a basis for liability against Kobritz, Johnson or Allied Produce Company, does not alter our conclusion. The three reasons

assigned by the court for its denial were separate and independent, not interdependent.

From what has been said it is clear that the trial court properly exonerated defendants on the second cause of action, but erroneously exonerated them on the first cause of action. The issues presented by the first cause of action must be retried.

The judgment appealed from is reversed. Each party shall pay his own costs upon this appeal.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied December 29, 1951, and respondents' petition for a hearing by the Supreme Court was denied January 24, 1952. Schauer, J., voted for a hearing.