[Civ. No. 27919. Second Dist., Div. Three. Nov. 16, 1965.]

STANLEY R. SMITH et al., Plaintiffs and Respondents, v. SAMUEL A. TURNER et al., Defendants and Appellants.

Lind & Schmitz and Edmund I. Read for Defendants and Appellants.

Tincher & Blumberg and Myron Blumberg for Plaintiffs and Respondents.

ASHBURN, J.*—Defendants appeal from judgment for plaintiffs in action for recovery of moneys paid by them for shares of stock in a California corporation named Sam Turner Mfg. Co., which payments were made under a preincorporation subscription agreement that preceded any steps toward incorporation. ▮▮▮ Defendants relied principally upon a plea of *pari delicto* which was rejected by the trial judge.

The purpose of the corporation was to finance the perfection and promotion of a patented machine or device for lifting and moving bed patients, an activity in which defendant Samuel A. Turner (frequently referred to herein as Sam) was engaged. He was to put his machinery and other properties represented to be worth $30,000 into the corporation and plaintiffs were to supply certain money, all by way of purchase of corporate stock. After conference with an attorney, attended by defendant Sam Turner and the four male plaintiffs, a preincorporation subscription agreement was prepared

---

*Retired Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

by the attorney and signed by the plaintiffs.[1] This was done pursuant to section 25153, Corporations Code, which provides: "(a) No provision of the Corporate Securities Law prohibits subscription for shares of a domestic or foreign corporation made prior to the incorporation thereof, . . . but each such subscription is made and accepted upon the following conditions: (1) The corporation shall be incorporated . . . within 90 days thereafter. (2) The corporation, when incorporated, . . . shall with reasonable diligence apply for and secure from the commissioner a permit authorizing the issue of the shares or the sale of the interests so subscribed for, in accordance with such subscriptions." These sub-paragraphs (1) and (2) are cast in the form of conditions and operate as conditions subsequent, violation of which invalidates subscriptions. (*First Nat. Bank* v. *Thompson,* 212 Cal. 388, 403-404 [298 P. 808]; *Rossi* v. *Jedlick,* 115 Cal.App. 230, 234-235 [1 P.2d 1065]; *Herkner* v. *Rubin,* 126 Cal.App. 677, 680 [14 P.2d 1043]; *California Western Holding Co.* v. *Merrill,* 7 Cal.App.2d 131, 141-142 [46 P.2d 175]; 44 Cal.Jur.2d, § 41, p. 467.)

The portion of section 25153 above quoted is followed immediately by this: "(b) Except as is specifically required by any law of this State, nothing in this section permits any of the following: (1) The collection of any portion of the consideration to be paid on account of subscriptions made prior to incorporation . . . unless and until a permit has been issued by the commissioner authorizing such collection. . . ."

The subscription agreement used in this instance contained the statutory conditions above quoted but does not incorporate or reflect the prohibition of (b) (1) against collection of any portion of a subscription "unless and until a permit has been signed by the commissioner authorizing such collection"; nor does the agreement mention the subject except to say that each subscriber "will accept and pay the purchase price for such shares . . . in accordance with this agreement." The document was signed by plaintiffs on January 21, 1960 and on that same occasion they paid Sam Turner for their stock, received from him a promissory note for the amount of the subscription containing this language: "This note will be

---

[1]Each of these plaintiffs signed the preincorporation subscription agreement on behalf of his wife as well as himself, but the wives took no active part in the matter. Each of plaintiffs Lofthus, Smith and Crow subscribed for 20 shares at $100 per share, and Jones for 15 shares, or $1,500.

redeemed by stock as soon as stock is issued";[2] plaintiffs also signed a document authorizing immediate use of the funds.[3] Samson Mfg. Co. was at that time a trade name under which Sam Turner was doing business. The original of this document does not reflect the composition of a lawyer or the typing found in the preincorporation agreement and distinctly speaks of preparation by a layman. Presented by Sam, it inferentially was prepared by him. Plaintiffs' attorney in open court made the following statement: "MR. BLUMBERG: They admit, as I understand them, that these people gave them money for stock and they even admit, as I understand, that they gave it without having a permit— THE COURT: —to issue the stock. MR. BLUMBERG: That is now admitted." Defense counsel did not deny this.

So far as Sam was concerned this violated the terms of the statute, invalidated the subscription and rendered the receipt of the money illegal (*People* v. *Otterman,* 154 Cal.App.2d 193, 199-200 [316 P.2d 85]). But it does not appear affirmatively that plaintiffs were aware of the restriction upon collecting the purchase price of the stock before issuance of a commissioner's permit. The record merely discloses that they were told the money was "to be redeemed by stocks" and was to

---

[2]The trial judge ruled that the note was immaterial and excluded it, but the fact that it was given and contained the quoted language remained in the record.

[3]

"SAMSON MFG CO
22041 Dolores Street
Torrance     Calif.

AGREEMENT

We the undersign here in do understand and agree the Money Paid in to SAMSON MFG CO is to be used Only for the Purpose of Paying for all Materials and Expence of Mfg PATIENT LIFT
and it is Understood by all Parties that this Money is to be used as of this Date Jan 21 1960 While the Said Company is Forming a Corporation to Issue Stock to Said Parties

               Goldie M. Jones
[s]:  George W. Jones or *[George W. Jones]

     Stanley R. or Geneva A. Smith

     Lucy W. Crow & Vivian Crow

     Larry G. Lofthus or Jean Lofthus

     ..............................
     .............................."

---

*Bracketed material was stricken out in the original.

be used on the invention as plaintiffs and said defendants "were anxious that the work get started and that the project get underway and proceed as fast as possible." None of the plaintiffs had knowledge, so far as is shown by the record, that the payments made to Sam were unlawfully taken by him. The subscriptions were void and the moneys paid to Sam were lawfully repayable to the respective buyers of stock. Up to this point no *pari delicto* appears, for mere knowledge of violation of the act by Sam would not have defeated plaintiffs' recovery had they possessed such knowledge and sought immediate payment at that time. (*Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777]; *Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733, 745 [24 P.2d 971, 88 A.L.R. 1271]; *Willens* v. *Hagge*, 154 Cal.App.2d 242, 243 [316 P.2d 29]; *Randall* v. *Beber*, 107 Cal.App.2d 692, 701 [237 P.2d 994]; *Gormly* v. *Dickinson*, 178 Cal.App.2d 92, 103 [2 Cal. Rptr. 650].)

Plaintiffs were not men of financial or business experience; Smith, Jones and Lofthus were longshoremen; Crow was a Los Angeles fireman; but they were not lacking in ordinary intelligence, as is shown by their subsequent conduct and their testimony. They were enthusiastic about the future of the invention; with their specific consent Turner proceeded immediately to expend their money in the business.

In July of 1960 the Commissioner of Corporations sought information additional to that contained in the application for a permit. The attorney who was handling the matter responded by letter of October 11, 1960, which concluded as follows: "Enclosed also are statements from each proposed issuee. They each state they have purchased shares, this is not correct. They have only signed up to purchase upon issuance of a permit. All of their money is 'put' up at the bank for use only when and if a permit is issued." The statement that the proposed "issuees" had not purchased shares was not true; nor was it true that they had only signed up to purchase upon issuance of a permit for they had subscribed and paid for their stock on January 21, 1960. The last sentence to the effect that all their money was banked "for use only when and if a permit is issued" was likewise untrue. The commissioner replied that the acceptance of any consideration without a permit violated the law and "requested that such funds be returned to the issuees immediately." Counsel stipulated that none of the plaintiffs was aware of this correspondence, but it moved Sam into action. He obtained from each plain-

tiff a written statement prepared for submission to the commissioner, copy of exemplar is set forth in the margin.[4]

Some nine months passed after plaintiffs had put up their money and they were becoming restive about getting their stock. Lofthus had asked Sam to sell a portion of the enterprise so he could have his money back. Plaintiffs were demanding an accounting in July and were furnished one that was unsatisfactory; it was followed by another which was even more unacceptable for it showed that Sam had credited himself with $5,175 manager's salary contrary to agreement.

Pursuant to the commissioner's request for return of the investors' money Sam obtained from each of them a receipt, exemplified by the one given by Lofthus and reading: "Received 2,000.00 Dollars as Deposit From S.A. Turner." These receipts were false and were intended for transmission to the commissioner; they were sent in a letter from the attorney bearing date October 22, 1960, which said: "My client advises the funds have been returned as requested in your letter of October 18, 1960. Receipts from the interested parties are enclosed for your examination." Thereupon the first and only permit was issued on October 31, 1960.

Jones, knowing he had not received return of any of his money, signed such a receipt and testified: "By Mr. Schmitz: This you gave to Sam Turner to submit to the Corporations Commissioner in connection with the issuance of this stock; that is true, is it not? A. Yes." Also: "Q. And did all four of you give Sam Turner a receipt acknowledging return of the money? A. I think so." He also said he previously had asked for his stock four times and "We never got a definite reply until we got this other letter that we had to sign, turning our money back over before stock could be issued." "He said he needed this to send into the Commissioner of Corpora-

---

4

"October 6, 1960

"To Whom It May Concern:

"I have known Mr. Sam A. Turner for a period of approximately (20) years. I am satisfied that he is honest and sincere in his representation of this machine and device for lifting and moving patients.

"I have purchased fifteen (15) shares at one hundred dollars ($100.00) per share.

"I have never been in business for myself at any time.

George W. Jones
[s]:   George W. Jones
        1866 263rd St.
        Lomita, California"

tions before we could get our stock. . . . To let us—he had to give us our money back.'' ''He said he could not give us back the money, that part of it was spent. Larry Lofthus wanted his money back, and Mr. Turner said he would sell the stock so that Larry could get his money back. As far as the rest of us, we were getting shakey, but there was no need in us trying to ask for our money back if he couldn't get his money back, so it stopped there. . . . The Court: Didn't you sign a receipt that you got it back? The Witness: I did. The Court: Why did you do that? You didn't get anything back? The Witness: No, sir. Q. By Mr. Blumberg: Was that at the request of Mr. Sam Turner? A. Yes. Q. And did he tell you that unless you signed that receipt you weren't going to get the stock? A. Yes.''

Lofthus testified he signed such a receipt but got no money. ''By Mr. Blumberg: What did he tell you about that? A. That was the same thing. He said that he shouldn't have taken the money without the permit, and the stock, and that we—although he didn't have the money to return to us, to sign these so that it would clear up the stock issuance. Q. Now, at that time, were you relying on Mr. Turner to take care of the whole transaction with the Corporations Commissioner? A. Yes. Q. And was it your impression at that time that what he was doing was correct and proper? A. Yes. . . . Q. What Sam Turner told you, as I understand, was that he was required to show that you had received the money back; is that correct? A. Yes. Q. Did he tell you what would be the result if you did not sign that receipt? In other words, did he say what you would or would not get if you wouldn't sign that receipt? A. Well, the stock wouldn't be issued without those papers.'' ''Q. Did I understand you to say that Sam told you that, in effect, the Corporations Commissioner had said that there was a premature payment of money and it had to be paid back; is that right? Did Sam tell you that? A. Yes. Q. And for the purposes of showing that it was being paid back is why you signed this receipt, is that true? A. Yes. Q. And you knew that he was going to send that into the Corporations Commissioner; that's also true, is it not? A. Yes. Q. And, as a matter of fact, though, it was not true that you had received the $2,000.00 back? A. That's right. Q. And you knew that it wasn't true at the time you signed the receipt? A. Yes . . . By Mr. Blumberg: Q. Did Sam Turner tell you that if you signed the receipt that that was all that was necessary to make a valid issue of the securities? In other

words, that the stock would then be legally issued and all you had to do was sign the receipt; is that, in effect, what he told you? A. Yes. . . . THE COURT: Is it fair to say that at that time you weren't interested in getting back your $2,000.00, but were interested in getting the stock? THE WITNESS: No, I was interested in getting the stock because I couldn't get my $2,000.00. THE COURT: How did you know? THE WITNESS: He said he couldn't pay us; he didn't have the money. THE COURT: He hasn't had the determination of that. You are still trying to get it and you are in court to get it. You mean you couldn't—he wouldn't give it to you voluntarily; is that what you mean? THE WITNESS: Yes. THE COURT: Well, you were sure you wouldn't get it from him, were you? THE WITNESS: Yes. THE COURT: So you were then willing to take the stock? THE WITNESS: Yes.''

Plaintiff Crow testified to signing a receipt for $2,000 ''for use in connection with the application for a permit to issue stock'' although he did not receive any money. ''He [Sam] said he had to have it before he could have stock issued. . . . Q. You trusted him and had faith in his integrity, did you not? A. Yes, I did. Q. Was it your impression or understanding at that time that what he was doing was with all propriety? A. Well, what do you mean by, 'propriety'? Q. Well, you trusted him to do whatever was right in order to carry out the transaction? A. Yes, I did.'' ''Well, it was a problem of a portion of it being spent where it couldn't have been returned if we wanted it, so it was a matter of more or less going along with the situation the way it was.''

Plaintiff Smith said he signed a statement, Exhibit F, ''following some conversations concerning the Corporations Commissioner requiring such a statement concerning [his] relationship with Sam Turner'' and about the same time executed a receipt to Sam for $2,000 but did not get any money. Sam ''said we had to send that to get our stock''; also that ''if we signed the receipts, they would issue the stock.'' ''However, you knew when you signed that receipt that you had received $2,000.00, that that was not true? A. Yes, I did.''

While plaintiffs thus joined in misrepresentation of facts to the Commissioner of Corporations for the purpose of inducing him to issue a permit based upon false assumptions as to the underlying facts and alleged compliance with the law, they nevertheless were in a predicament that induced and indeed coerced them into relying upon Sam's assurances in the hope that they would receive the stock or a return of some part of

their money. In considering the plea of *pari delicto,* we shall bear in mind that the result of upholding it would be that Sam would reap all the benefit of the transaction and plaintiffs would lose the entire purchase price they had paid him; Sam had had previous corporate experience and they had had none or practically none; they belonged to the class of people that the statute was intended to protect, and they were not upon an equal basis with Sam in dealing with him. They joined with Sam in thus imposing upon the commissioner who had "requested" return to plaintiffs of the moneys paid by them for their shares, which request was based upon the violation of the law by Turner through collecting the purchase price of each block of stock in the absence of a permit; they knowingly presented to the commissioner false statements of facts which were calculated to induce him to close his eyes to a violation of the law and to authorize issuance of shares in fulfillment of void subscriptions.

*Randall* v. *Beber, supra,* 107 Cal.App.2d 692, 701 says: "The illegality which tainted this transaction prior to the issuance of the permit tainted the entire transaction. As said by this court in *Bourke* v. *Frisk,* 92 Cal.App.2d 23, at page 31 [206 P.2d 407], 'Such essential part being tainted with illegality infected the entire transaction and completion of the sale by issuance of the shares at a later time could not make it valid.' "

We have concluded that the case of *Miller* v. *California Roofing Co.,* 55 Cal.App.2d 136 [130 P.2d 740], upon which appellants rely is not conclusive here. At pages 142-143 the court said: "It is true, as pointed out by defendants, that the shares in this case cannot be held to be void because they were not 'issued' to plaintiff until after a permit had been obtained, and then only in strict compliance with the requirements of the permit. In other words, the factual situation is one not contemplated by section 16 of the act which declares that shares issued without a permit or in non-conformity therewith shall be void. However, as we pointed out at the outset, the question here involved is the validity of the *sale,* not the validity of the *shares.* The distinction is clearly pointed out in the case of *Otten* v. *Riesener Chocolate Co., supra* [82 Cal. 83 (254 P. 942)]; see, also, *Duntley* v. *Kagarise, supra* [10 Cal.App.2d 394 (52 P.2d 560)]. The fundamental theory underlying all of these cases is the fact that a sale, which for any reason is in violation of the Corporate Securities Act, should on the grounds of public policy be held

to be illegal. In the furtherance of this policy we so hold in the case at bar. [¶] This holding, however, does not determine all of the issues involved in this case. Even though the sale was illegal, there still remains the question whether or not the plaintiff was *in pari delicto.*" After holding that plaintiff's conduct was erroneously characterized by the trial judge as working an estoppel against him, the court further said at page 144: "The trial court found 'that at and before the time that plaintiff actually paid to defendant corporation the said sum of $2,500.00 for the purchase price of the stock in defendant corporation on February 18th, 1938, plaintiff was informed by the defendants and knew that defendant corporation was not at that time authorized to issue stock to plaintiff and that legal proceedings would have to be taken before any stock could be issued to plaintiff.' " Plaintiff had signed an agreement of December 15, 1938, prior to issuance of stock to him, concerning which the court said at pages 145-146: "By this document all of the parties in effect represented to the Commissioner of Corporations that no sale had yet taken place and that $2,500 in new capital was to come into the corporation, when in truth and in fact the plaintiff already considered himself a stockholder and the $2,500 had been received by the corporation some ten months before and had been used by it in the expansion program. The plaintiff knew from the first that a permit was required, he also knew that none had been obtained when he parted with his money, and he was so intent in his determination to obtain a financial interest in the defendant company that he was willing to execute an agreement, the effect of which constituted a fraud upon the Commissioner of Corporations. . . . Viewing the transaction as a whole, we believe the plaintiff was equally culpable with the defendants, therefore *in pari delicto* and not entitled to recover. (*Campbell* v. *Julian Merger Mines, supra* [111 Cal. 649 (295 P. 1040)].) "

This case has been cited with approval and followed in later cases. See, *inter alia, Randall* v. *Beber, supra,* 107 Cal. App.2d 692, 701; *Taormina* v. *Antelope Mining Corp.,* 110 Cal.App.2d 314, 321 [242 P.2d 665]; *Nicholl* v. *Ipsen,* 130 Cal.App.2d 452, 456 [278 P.2d 927].

As above stated, this *Miller* decision is not determinative of the case at bar. It is distinguishable upon its facts, was not reviewed by the Supreme Court because no petition for hearing was filed, and must yield, we think, to the philosophy of the Supreme Court decision in *Tri-Q, Inc.* v. *Sta-Hi Corp.,* 63 Cal.2d 199, 218 [45 Cal.Rptr. 878, 404 P.2d 486], which

was authored by Mr. Justice Peters, who also concurred in the *Miller* opinion. The same justice prepared the opinion in *Norwood* v. *Judd,* 93 Cal.App.2d 276 [209 P.2d 24].

That case involved dissolution of a contractors' partnership and the question of whether their failure to secure a partnership license would defeat plaintiff's recovery of an accounting although he himself was not a contractor or licensed as such. At pages 288-289, the court said: ''The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But the courts should not be so enamored with the Latin phrase *'in pari delicto'* that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied. That is the theory of the Denning case, and of the other cases above cited, and we think it is the correct and more enlightened rule.'' This reasoning was carried into the case of *Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d 199, which involved an agreement affording the contracting parties ''a means by which both parties could have taken improper tax advantage of the federal and state governments'' (p. 216). It was held that the lower court had erroneously applied the doctrine of *pari delicto.* The court said at page 216: ''There is no doubt that the general rule requires the courts to withhold relief under the terms of an illegal contract or agreement which is violative of public policy. . . . These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract. They do not necessarily apply to both parties to the agreement unless both are truly *in pari delicto.* '' The *Norwood* case is then quoted (as above), numerous cases cited in which Norwood has been cited and followed, and the court continued at pages 218-219: ''A clear statement of the exception to the general rule appears in *Lewis & Queen* v.

*N.M. Ball Sons, supra*, 48 Cal.2d 141 [308 P.2d 713], where the court, after first setting forth the policy behind the general rule, stated (at p. 151): 'In some cases, . . . effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.'

"If these rules be applied to the facts of this case no reason appears why Satre should be denied the aid of the courts in obtaining the agreed consideration for the assets which he has delivered to Sta-Hi. Except for payment of that consideration, 'the transaction has been completed,' and the public requires no further protection. Sta-Hi is clearly guilty of the greater moral fault, and Satre's conduct involved little, if any, serious moral turpitude. Certainly, refusal of the court to enforce the agreement would 'permit defendant [Sta-Hi] to be unjustly enriched at the expense of plaintiff.' Such a course would result in a forfeiture 'disproportionately harsh considering the nature of the illegality,' and the respective conduct of the parties. Finally, 'effective deterrence . . . [will be] best realized by enforcing plaintiff's [Satre's] claim rather than by leaving the defendant [Sta-Hi] in possession of the benefit.'

"The trial court, while quite correctly expressing moral indignation at the attempt to defraud the two governments, actually frustrated the purpose of the general rule on which it relied. Sta-Hi was the party who sought either rescission or declaratory relief. Because the contract (under which Sta-Hi had paid the first $25,000 of the consideration intended for the stock) had been fully executed, and the stock delivered, Satre's only remedy was to seek enforcement of the very agreement which Sta-Hi sought to rescind. By refusing to enforce that agreement, the trial court, in effect, granted Sta-Hi's request for declaratory relief. The unintended result of such judgment was to grant relief to the wrongdoer, while denying such to the party who was guilty of little, if any, moral turpitude." Hence the judgment was reversed, the Supreme Court thus approving and adopting the reasoning of the *Norwood* case and establishing a precedent which in our opinion does not square with *Miller* v. *California Roofing Co., supra*. In this connection see also *Colby* v. *Title Ins. & Trust Co.*, 160 Cal. 632, 640 [117 P. 913, Ann. Cas. 1913A 515,

35 L.R.A. N.S. 813]; *Belling* v. *Croter*, 57 Cal.App.2d 296, 304 [134 P.2d 532]; 6A Corbin on Contracts (1962), §§ 1537 and 1518.

The trial judge having ruled for the plaintiffs, making an express finding upon this issue in their favor, we have concluded that the doctrine of the *Sta-Hi* case is here applicable rather than that of *Miller,* and the judgment against Samuel A. Turner must be affirmed.

▇ Appellants Charles A. Turner and Bertha M. Turner contend that the judgment which runs against them as well as Samuel A. Turner must be reversed because of absence of any evidence to establish liability on their part.

Bertha M. Turner is the wife of Sam, and Charles is their son. Sam testified on deposition that he and his wife were business partners at the time he met plaintiffs and for a number of years prior thereto and that she was active in the business. The deposition also said: ''A. Well, I don't know whether I would say partner or not, but I rely on her quite a bit. Q. At any rate, she participates with you, does she not, in business decisions and is part of the business with you? A. She helps me make decisions sometimes, yes.'' At the trial Sam denied that Mrs. Turner was a partner, thus raising an issue upon which the trial judge impliedly ruled against him.

The joint pretrial statement says that paragraphs III, IV and V of the fifth cause of action are admitted, which admissions spell the truth of allegations that Samuel, Charles and Bertha caused the corporate articles to be filed and that the certificates for stock were executed by Bertha and Sam as corporate secretary and president, respectively. The joint statement also establishes that Sam was acting for the corporation in receiving from plaintiffs the purchase price of the shares and in depositing the $7,500 to the credit of the corporation. The articles of incorporation [Exhibit 4] show the three Turners to be the sole incorporators and sole directors, and bear their respective signatures.

The application for a permit to issue stock [Exhibit 5] contains a copy of minutes of the first meeting of directors authorizing the president and secretary, upon issuance of a permit, to accept Sam's offer to turn over certain assets in exchange for 82 shares of stock, to take all actions necessary to perform the obligations of the corporation as set forth in said offer; authorizing any officer to cause to be prepared and presented to the commissioner an application for a permit to

issue stock to the respective plaintiffs; also: "FURTHER RESOLVED, that upon the issuance of a permit by the Commissioner of Corporations of the State of California pursuant to such application, the president, or the vice president, and the secretary, be and they hereby are authorized and directed to sell and issue shares of stock of this corporation to the persons and in the amounts and for the consideration stated in and in compliance with all of the terms and conditions of such permit and these resolutions. FURTHER RESOLVED, that the officers of this corporation be and they hereby are authorized and directed to execute all documents and to take such actions as they may deem necessary or advisable in order to carry out and perform the purposes of these resolutions." All three directors waived in writing notice of the meeting, and all of them were present.

Defendant Charles A. Turner testified that he had no financial interest in the corporation; that he signed the incorporation papers because they had to have three parties and he was "there" convenient and his father asked him to do so; that he worked with his father in the evenings and on Saturdays, was not paid for any of his labor; did not talk with plaintiffs about putting up money; nor did he receive any of their payments. He said he did attend meetings of the directors in the evenings but was not active, was just a director "as an accommodation"; that he was not involved in any meetings after the first one and had nothing to do with direction or management after the first meeting. Sam, according to his own testimony, was manager and "boss" at the shop. Charles said he had a social relationship with Jones but did not "remember for sure" whether it was his discussions with Jones that got him "sort of interested in making some inquiry about getting involved financially"; that he did tell Jones it [the investment] "could be" a "terrific thing."

Defendant Bertha testified that she was one of the incorporators and signed the articles; that she got no part of plaintiffs' $7,500, was not in possession of it, and had nothing to do with the same; she and Sam had been married for 42 years and all their property had been acquired over the years from the work of herself and her husband. During the trial, the court suggested that "She is responsible as a result of the community property law; is that what your contention is? MR. BLUMBERG: That is our contention."

The foregoing evidence warrants the inference (impliedly drawn by the trial judge) that both defendants Bertha and Charles actively participated in the transactions that violated

the Corporate Securities Law and hence became liable to plaintiffs under the principle that all active participants in a tort are liable for the full amount of damages regardless of whether they received any of the proceeds of the wrong.

*Gormly* v. *Dickinson, supra,* 178 Cal.App.2d 92, 102: " '[I]t is also the law that a person who sells a security impliedly represents that a permit therefor has been secured when one is required by law for such a sale, and if this implied representation is false, then it is negligent misrepresentation which is an actionable fraud (*Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501, 525 [86 P.2d 102]); and where, as here, the action is for damages for fraud, recovery may be had against all persons participating in the fraud, whether they received a portion of the money paid or not (*Auslen* v. *Thompson,* 38 Cal.App.2d 204, 212, 213 [101 P.2d 136])."

*Mannion* v. *Baldwin,* 217 Cal. 600, 604 [20 P.2d 678]: " 'It is earnestly contended by respondents that there is substantial evidence to support the finding that the stock in question was the personal property of Mrs. Sykes, hence her sale to plaintiff did not come within the purview of the Corporate Securities Act. (*People* v. *Pace,* 73 Cal.App. 548 [238 P. 1089].) The answer is that Mrs. Sykes was a director of the company and present when the unauthorized issue of the stock was made. It does not lie in her mouth to now say that her sale was a private one. She knew that the stock was void, and sold it to an innocent party with this knowledge, and must be held liable for any loss which resulted. Defendants Baldwin and his wife and Gladys Sykes were all directors who were present at the meeting which voted to issue the stock in violation of the permit. They are active participants, and equally liable. (*O'Connell* v. *Union Drilling & Petroleum Co.,* 121 Cal.App. 302 [8 P.2d 867].)" See also *Mary Pickford Co.* v. *Bayly Bros., Inc.,* 12 Cal.2d 501, 514-515, 525 [86 P.2d 102]; 47 Cal.Jur.2d § 8, p. 701; 23 Cal.Jur.2d § 47, p. 115; 44 Cal.Jur.2d § 120, pp. 531-532, § 124, pp. 536-537, § 130, p. 541.

We conclude that all the plaintiffs are entitled to recover against each of the defendants and the judgment should be affirmed in its entirety.

Judgment affirmed.

Shinn, P. J., and Kaus, J., concurred.